Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3456 | **DATE** | 4/29/2002 |
| **CASE TITLE** | Cathedral Trading, et al. vs. The Chicago Board of Exchange, et a | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion to dismiss is granted. Accordingly, counts I, II and VI are dismissed. The state law claims Counts III, IV, V, VII, VIII and IX are therefore dismissed as well. Any pending motion in this case is terminated as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 4 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | date docketed | |
| | Notified counsel by telephone. | | | 24 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 4/29/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MPJ | courtroom deputy's initials | Date/time received in central Clerk's Office | MPJ mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CATHEDRAL TRADING, LLC, LTC )
TRADING, INC., ELIZABETH )
ECKLUND SMOLINSKI, KRISTOPHER )
SMOLINSKI, RAY BARKER, BRIAN )
GILL, MATTHEW KUNDRAT, and )
MICHAEL POWERS, )
 )
         Plaintiffs, )
 )
v. ) No. 01 C 3456
 )
 )
THE CHICAGO BOARD OPTIONS )
EXCHANGE and THE OPTIONS )
CLEARING CORPORATION, )
 )
         Defendants. )

## MEMORANDUM OPINION AND ORDER

The plaintiffs in this securities fraud action trade options on U.S. options exchanges, including the Chicago Board Options Exchange ("CBOE"). They are not members of the CBOE or other exchanges but are retail customers in the business of trading in options and stocks. The CBOE issues equity and index options individually and also in concert with Options Clearing Corporation ("OCC"), a Delaware corporation, of which the CBOE is a part owner. The OCC provides various facilities for trading options used by several options exchanges, including the CBOE, and the plaintiffs allege that for options issued or settled through the OCC, the CBOE controls the OCC. The plaintiffs say that the defendants have



prevented many of their trades from being executed or confirmed and refused to honor consummated transactions. They sue under several federal securities statutes, the federal antitrust laws, and a number of state causes of action. The defendants move to dismiss, and I do so.

I.

Options are securities that give their owners the right to buy or sell other securities at certain prices at a future date. They are traded on several exchanges, including the CBOE, which compete for business. The CBOE is supposed to offer the best quoted price for an option available on its floor, though better prices may be available on other exchanges. The prices are transmitted to a central authority that combines the information, which is used by market makers to set prices and by the public to make investment decisions. Under SEC rules, options have been traded on multiple exchanges since 1990 to reap the benefits of competition for business among exchanges. However, in the 1990s the SEC found that the CBOE had conspired with other option exchanges not to offer multiple listings of many options, see SEC Release No. 34-43268 (Sept. 11, 2000), and the Justice Department investigated antitrust violations connected to the same conspiracy. As a result, the options exchanges began to offer more "multiply-listed" options. With such listings, exchange members and retail customers can both monitor and trade against competing bids offered at various options

exchanges. The plaintiffs in this case are retail customers who trade options using sophisticated computer technology. From mid-1999 to the present, the plaintiffs have placed numerous retail orders on a daily basis at the CBOE.

The CBOE and OCC have disseminated a good deal of information to the public in order to solicit business. These defendants maintain a website, http://www.cboe.com, with information about the options, the trading systems, market information, tips on strategy, and free software. This website material represents that CBOE order handling, routing, and execution systems "guarantee our customers the fastest and most equitable transactions." Two documents, one dated April 30, 1997, that the OCC identifies as a "prospectus," and another headed with the CBOE logo and available on the Internet, titled *Characteristics and Risks of Standardized Options*, which is furnished to investors as required by law, state that the CBOE ordinarily becomes obligated to accept an option transaction on the next business day if reported in a timely way, and that premiums for multiply traded options may differ across markets. An investor may therefore buy a multiply-listed option on the CBOE and offset his position on another exchange.

The CBOE also published an information booklet called *Welcome to the Chicago Board Options Exchange* (the "*Welcome* booklet") representing that all equity options are traded under the "Designated Primary Market Maker" ("DPM") system to ensure a fair

-3-

and orderly, continuous, two-sided market. DPMs are individuals designated to "make" the markets by trading in certain specific ways. The *Welcome* booklet states that DPMs determine the formula for generating automatically generated market quotations, that the system that disseminates the quotations is accurate, and that DPMs must participate at all times in any automated execution system that may be open, and, moreover, are present at the trading post through the business day, and, with respect to their trades as market makers, effect trades that correlate well with the overall trading pattern for each series in the options classes involved. The *Welcome* booklet states that if a DPM quotes a price that matches the order of a floor broker's customer, "a trade occurs." CBOE Rule 8.51 states that a "firm quote requirement generally applies at all times" and "obligates the trading crowd to sell (buy) at least the established number of contracts at the offer (bid) which is displayed when a[n] . . . order reaches the trading station."

The CBOE has also developed an electronic order execution system called the Retail Automatic Execution System ("RAES"). Literature available on the CBOE website says that orders "that fall within designated premium levels, contract size, and series parameters are guaranteed a fill at the current market bid and offer." The DPMs are authorized to deactivate RAES, thus preventing a trade from being executed automatically, in only two

-4-

circumstances. The first is if floor conditions become too heavy. In that case, the floor brokers can use a "Public Automated Routing System" ("PAR") to execute trades. This is a PC-based touch-screen, order routing and execution system that allows brokers to present a customer order to DPMs and other market makers. It also allows DPMs to determine the identity of a retail customer or his clearing house before executing the trade. When RAES is deactivated because of heavy trading, the floor brokers can send all their orders from their PAR workstations to an automated customer order book known as the "Electronic Book" ("EBOOK") that automatically sorts and files trades in price and time sequence. The other circumstance in which CBOE represents that RAES may be deactivated is when a competing exchange offers a better price on a multiply-listed option, in which case the order is printed in the public order book and announced to the trading crowd for execution. CBOE rule 6.8 requires market markers to sell/buy a customer's RAES order.

The plaintiffs allege that the defendants, individually and together, have lied in saying that they will execute trades fairly and automatically, inducing the plaintiffs, in reliance on those statements, to trade on what were in fact unfavorable terms, and failed to disclose substantial additional risks that orders would be arbitrarily mishandled to the plaintiffs' detriment. The defendants have prevented many of the plaintiffs' trades from being executed or confirmed, and offered pretextual explanations about

why trades were not executed. They have arbitrarily deactivated RAES so that retail customers like the plaintiffs have no access to automatic execution, and refused to execute their trades or "faded," moving the bid or offer away from the plaintiffs' order after the plaintiffs have placed an order on RAES at the market limit price. The defendants have done this because they recognize the plaintiffs as being on the other side of the trade, and would prefer to deal with customers who are less sophisticated, less likely to know that they are being cheated or to complain.

The complaint says that "upon information and belief," the defendants have failed to execute trades with the plaintiffs, bypassing them to execute trades on identical bids or orders with less sophisticated customers, and also on "information and belief," have failed to honor (or "busted") consummated electronic trades if these turn out to be bad for the DPMs and other market makers, while providing various phony excuses for this misconduct. As recently as February 21, 2001, the defendants published a blacklist of persons with a "history of questionable RAES trades or potential manipulative activity," including the plaintiffs; these accusations are false, but as a result, clearing firms have closed the plaintiffs' trading accounts, barring them from the market.

II.

Heightened pleading requirements apply to all the fraud

claims.[1] Any federal securities fraud claim must comply with the Private Securities Litigation Reform Act ("PSLRA"), requiring the complaint to "state with particularity all facts on which that belief [in scienter amounting to recklessness] is formed." 15 U.S.C. § 78u-4(b)(1); the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). Although states of mind "may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (Fed. R. Civ. P. 9(b) context). Under Rule 9(b), heightened pleading standards also apply to other sorts of fraud claims. *Id.* Despite the wealth of detail about options trading in this 44-page complaint, the actual fraud allegations are vague, generic, and nonspecific.

The plaintiffs fail to identify any specific transactions constituting the fraud, the "what" about which they complain. Fraud cases have been dismissed for failure to satisfy the specificity requirements when the plaintiff failed to provide "a single concrete example" of a particular fraudulent activity. *DiLeo*, 901 F.2d at 626. The plaintiffs do not offer any concrete examples. Plaintiffs are not required to "plead facts to which they lack

---

[1] Count III, IV and V expressly allege Illinois state law fraud claims. I defer discussion of Count II, the § 12 claim, until the following section.

access prior to discovery," *Katz v. Household Int'l., Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996), but here the plaintiffs claim they have the information on which their claims are based. Also unsatisfactory are allegations like those in ¶ 53, that, upon "information and belief," the defendants bypassed the plaintiffs' retail orders and failed to honor executed trades. "Allegations made upon information and belief are insufficient [to allege fraud] . . . unless the plaintiff states the grounds for his suspicions." *See Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); 15 U.S.C. § 78u(b)(1)(B). The plaintiffs fail to do so here.

The PSLRA requires that the plaintiffs specify "each statement" alleged to have been misleading. 15 U.S.C. § 78u-4(b)(1). The plaintiffs do quote two particular statements from literature published by the CBOE and the OCC, *i.e.*, that CBOE order handling, routing, and execution systems "guarantee our customers the fastest and most equitable transactions," and that "trades automatically occur" when certain requirements are met, Complaint ¶ 59, which if false and believed, would substantially increase the risks of trading on the CBOE. These statements are not puffery; they rule out deliberate discrimination against the plaintiffs, and would clearly matter to an investor. *See Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995)(standard for puffery). However, "'plaintiff[s] alleging securities fraud cannot simply quote

verbatim from annual reports and press releases and assert that the statements are untrue; [they] must explain in [their] complaint what is untrue about each of the challenged statements.'" 15 U.S.C. § 78u-4(b)(1)(B). *Clark v. TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at *4 (N.D. Ill. May 20, 1998). The plaintiffs fail to do this with reference to any particular transaction with the level of detail that would allow me to conclude that, if the specific allegations were true, the statement would be false. The other alleged omissions and affirmative misstatements characterized, *e.g.*, as "various oral statements" and "misleading explanations as to why trades were not executed," Complaint ¶ 56, are too vague to be actionable. The plaintiffs must say what was said or suppressed and why it was fraudulent to say or suppress it.

The "when" is not satisfactorily pleaded either. The plaintiffs allege, basically, that the conduct of which they complain has been going on since mid-1999. They do not give a specific date for any particular act. But it is not enough to allege that the defendants defrauded the plaintiffs in some way over a period of months or years. *Servpro Indus., Inc. v. Schmidt*, No. 94 C 5866, 1997 WL 361591, at *8 (N.D. Ill. June 20, 1997) (Ashman, M.J.) (Allegations of misrepresentations "in or about 1991," "prior to March of 1985," and "subsequent to the execution of the agreement" not sufficiently specific); *Brandt v. Jack Levy Assocs. Inc.*, No. 92 C 5075, 1993 WL 95383, at *1 (N.D. Ill. Mar.

30, 1993) (Duff., J.) (Same with allegations of lies "in early 1991 (no later than July of 1991 . . . .")). Perhaps the plaintiffs need not date every transaction. *DiLeo* suggests that some representative dated examples may be enough. But the plaintiffs must provide at least that much. Here they do not.

In view of the pleading defects in their complaint, the plaintiffs do not allege facts to support a "strong inference of scienter," 15 U.S.C. § 78u-4(b)(2).

### III.

Count II alleges that the defendants violated section 12(2) of the Securities Exchange Act of 1933, 15 U.S.C. § 77l(a)(2), creating liability for a person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact." A plaintiff has standing to sue under § 12(2) only if he is a purchaser of securities. Section 12 "imposes liability on persons who offer or sell securities and only grants standing to 'the person purchasing such security' from them." *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987); *accord Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687 (3d Cir. 1991). The plaintiffs allege that they were purchasers "the moment they clicked on their computer screens and placed their orders." They therefore satisfy this requirement for purposes of this motion.

However, there are pleading problems. Ordinarily, fraud and scienter are not elements of a § 12(2) claim. *See Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir. 1979). However, the Third Circuit has held that when a § 12(2) claim "'sounded in fraud' . . ., Rule 9(b) applies." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992). In that case, the Third Circuit reasoned, the § 12 claim:

> incorporate[d] by reference all preceding factual allegations, including those delineating defendants' "intent." It also states that the . . . prospectus was false and misleading "in the particulars previously described, and mentions the false and misleading nature "of the representations described above." Although [the § 12(2) count] does not allege fraudulent intent or recklessness (a prerequisite to a successful fraud claim), neither does it allege negligence. The specific factual allegations upon which Count II is based do, however, repeatedly aver that defendants "intentionally," "knowingly," or "recklessly" misrepresented and omitted to represent certain material information.

*Id.* at 287. *Accord Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996); *but see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) (disagreeing). Most relevantly, here, the Seventh Circuit has treated a § 12 case as a fraud case bound by the pleading requirements of Rule 9(b). *See Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990). The court did not set forth its reasoning in detail, but it has held that a suitable § 12 claim may sound in fraud. The § 12 count before me is on all fours with the one in *Shapiro*. The claims of intentional representation are

incorporated by reference, and the underlying facts of the § 12 and Rule 10b-5 claims are essentially the same. Since the § 12 claim sounds in fraud it must meet the heightened pleading requirements of the PSLRA of 1996. In view of that determination, the plaintiffs' pleading is inadequate for the reasons explained above.

IV.

Count VI alleges a violation of the antitrust laws. The plaintiffs claim that the defendants acted in concert and conspired with an anticompetitive motive to unreasonably restrain price competition, committed price discrimination, and engaged in anticompetitive conduct by manipulating the order handling systems at the CBOE to the detriment of retail customers like themselves in favor of the DMPs. Complaint ¶ 91. The facts that support these charges are the same as discussed elsewhere, *i.e.*, that the defendants faded, failed to execute, and "busted" the plaintiffs' trades. *Id.* ¶ 92. They claim as damages $100,000,000, trebled under 14 U.S.C. 15(a), in "lost profits, loss of business, amounts of overpayment, and interest." *Id.* ¶ 95 ff. Although the complaint is vague about the legal basis of their antitrust claim, the plaintiffs' response to the motion to dismiss clarifies the theory, and explains that the defendants' refusal to sell them options constitutes a per se illegal group boycott or concerted refusal to deal in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (prohibiting "conspirac[ies] in restraint of. . . trade"). Although

-12-

group boycotts are often characterized as per se violations, *See, e.g., Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457 (1941); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), an antitrust violation is per se illegal only if, upon facial examination, "the practice at issue is the type that always or almost always would tend to restrict competition." *BMI v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (citations omitted).

To bring a private antitrust action for treble damages under § 4 of the Clayton Act, the plaintiff must show: "(1) a duty recognized by the antitrust laws; (2) a violation of the antitrust laws; (3) injury to an interest protected by the antitrust laws and attributable to the antitrust violation--that is, antitrust injury; and (4) a direct link between the antitrust violation and the antitrust injury, that is to say, standing." *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 & n.7 (7th Cir. 1993). The inquiry is fact intensive and "no single factor is conclusive." *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995). The plaintiffs fail to satisfy these requirements.

First, there is no violation of any duty recognized by the antitrust laws. Although an illegal boycott may be directed against customers, *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 552 (1978), to be per se illegal, a boycott must have two essential

-13-

elements: (1) at least some of the boycotters were competitors of each other and the target, and (2) the boycott was designed to protect the boycotters from competition with the target. *United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981). The complaint does not allege either prong, and when the defendants argue that the plaintiffs are, as pleaded on the face of the complaint, consumers and not competitors, the plaintiffs agree, saying that they are "consumers, the very persons that are to be protected under the antitrust laws." The plaintiffs cite *St. Paul Fire* for the proposition that "it is an offense for businessmen to agree among themselves to stop selling to particular customers." *Id.* at 544. However, as the Seventh Circuit noted in *United States Trotting Association*, while the Supreme Court in *St. Paul Fire* held that consumers might maintain an action for anticompetitive boycott against competitors (insurers who conspired to force physicians to accept a particular kind of insurance), "'the issue before us is whether the conduct in question involves a boycott, not whether it is per se unreasonable.'" 665 F.2d at 788 n.11 (citing 438 U.S. at 542). There is no per se violation here.

The plaintiffs request that I also analyze the case under a rule of reason approach. However, the plaintiffs have not met the threshold requirements for such an analysis. There is no allegation that the defendants have any market power, and "[s]ubstantial

-14-

market power is an essential ingredient of every antitrust case under the Rule of Reason." *Sanjuan v. American Bd. of Psych. & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1995). Neither, as I shall explain, is there any "showing of anticompetitive market effect" that the rule of reason requires. *Lektro-Vend Corp. v. Vendo Co.* 660 F.2d 255, 268 (7th Cir. 1981). The plaintiffs cannot prevail under the rule of reason.

Second, there is no antitrust injury, *i.e.*, "injury of the type the antitrust laws were intended to prevent." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Such injury must be injury to competition, *e.g.*, "when consumers pay higher prices because of a market monopoly or when a competitor is forced out of the market." *Id.* The antitrust injury doctrine of *Bowl-O-Mat* "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992).

The plaintiffs' theory, raised in response, is that the defendants' boycott interfered with price-setting by the free market. This would be price-fixing, which is indeed per se illegal. *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993) (citing *United States v. Socony-Vacuum Oil*, 310 U.S. 150, 223 (1940)). However, there is no economic theory of

-15-

which I am aware on which the plaintiffs could prove any set of facts that would show that the defendants' conduct affected the price of options. The allegation here is essentially that the defendants and the DPMs cut the plaintiffs out of trading at the CBOE (but not elsewhere). But that could not affect options prices at all unless, first, the CBOE had market power. The plaintiffs do not allege this and indeed they do not even assert it in response when the defendants deny it. Second, for the theory to make sense, the plaintiffs would need the "weight" to move the market with their trades if they participated. But they do not allege this either.[2] I accept all well pleaded allegations in the complaint and draw every reasonable inference in the plaintiffs' favor, *Vickery v. Jones*, 100 F.3d 1334, 1341 (7th Cir. 1996), but it is not a reasonable inference to suggest that the activity of Cathdral Trading, Elizabeth and Kristopher Smolinski, Ray Barker, Brian Gill, Mathrew Kundrat, and Michael Powers on the CBOE, an exchange that is not alleged to have market power, and which is only one of several options exchanges, makes the difference between the entire options market operating efficiently and its not doing so.

---

[2] They allege only that their use of technology enables them to trade without distraction, Complaint ¶ 48, identify and eliminate disparities between price and value, and bring about a convergence of price with value, recognize market opportunities and profit from them, promote liquidity and narrow the spread between bid and offer. *Id.* ¶ 50.

It is an old slogan that antitrust laws were enacted for the protection of competition, not competitors. *Bowl-O-Mat*, 429 U.S. at 488 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). To vary the slogan, the antitrust laws protect consumers by maintaining competition for price, but they do not protect the ability of particular consumers to take advantage of a business opportunity unless they can show that and how their exclusion from that opportunity affects prices for everyone.

V.

I DISMISS the plaintiffs' securities claims (counts I and II) for failure to comply with the fraud pleading requirements. I DISMISS the plaintiffs' antitrust claim (count VI) for failure to state a claim. The state law claims (counts III, IV, V, VII, VIII, and IX) are therefore dismissed as well.

ENTER ORDER:

*Elaine E. Bucklo*
───────────────────────
**Elaine E. Bucklo**
United States District Judge

Dated: April 29, 2002